UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. 1:11-cr-00062- PAC |
| v. | Sentencing Date: March 27, 2015 |
| FOTIS GEORGIADIS, | |
| Defendant. | |

## DEFENDANT FOTIS GEORGIADIS' SENTENCING MEMORANDUM

Ronald J. Nessim
Marc E. Masters
BIRD, MARELLA, BOXER, WOLPERT, NESSIM
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East
Suite 2300
Los Angeles, CA 90067

*Attorneys for Defendant Fotis Georgiadis*

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     MR. GEORGIADIS' INVALUABLE AND EXTENSIVE COOPERATION
        AND CRITICAL TRIAL TESTIMONY AGAINST THE LEVYS ...................................4

III.    MR. GEORGIADIS' HUMBLE UPBRINGING, LACK OF EDUCATION,
        CLOSE FAMILY TIES, AND SINCERE ACCEPTANCE OF
        RESPONSIBILITY...................................................................................................9

IV.     THE ADVISORY GUIDELINES OVERSTATE MR. GEORGIADIS'
        CULPABILITY ........................................................................................................16

V.      MR. GEORGIADIS DESERVES A DOWNWARD VARIANCE ..................................18

        A.      Mr. Georgiadis' History And Characteristics, Including His Cooperation
                With The Government, Support A Probationary Sentence....................................18

        B.      The Need To Avoid Unwarranted Sentencing Disparities Between Mr.
                Georgiadis And Other Co-Defendants Supports A Probationary Sentence..........18

        C.      The Need For Just Punishment And Adequate Deterrence Support A
                Probationary Sentence ............................................................................................21

VI.     CONCLUSION.........................................................................................................22

# I.        INTRODUCTION

Defendant Fotis Georgiadis stands before the Court a remorseful and emotionally-broken –

yet also a much wiser – man. No words can fully capture how he has experienced the last few years

of life under the intense burden and stress created by the crime he committed, the unfortunate and

terrible consequences for the victims of the pump and dump scheme as well as for his family, and his

genuine and overriding desire to make amends.

What distinguishes Mr. Georgiadis from the other defendants in this case is his invaluable

and extensive cooperation with the government, including in connection with the prosecution of

David Levy and Donna Levy, the ringleaders of the conspiracy. That vital cooperation has earned

Mr. Georgiadis a § 5K1.1 letter in which the government concluded that, "unlike other defendants

who have been sentenced by the Court, Georgiadis testified before the Court about his criminal

activity as a cooperating witness. … Georgiadis' testimony proved extremely valuable to the

Government's case at trial. … The cooperation was particularly significant because the Levys were

the most culpable participants in the charged scheme, and were among the more significant

participants in pump and dump stock fraud in the United States at the time of their arrest and

conviction." Govt. § 5K1.1 Ltr. at 2, 4-5 of 6. Also, in highlighting one critical aspect of Mr.

Georgiadis' trial testimony, the government stated in its opposition to the Levys' Second Circuit

appeal that "Georgiadis' testimony alone was sufficient to establish Donna Levy's guilt on several

counts …." Govt. App. Br. at 25. The government's repeated and significant reliance in closing

argument on Mr. Georgiadis' "insider" testimony about the meetings and conversations he had with

both David Levy and Donna Levy further demonstrates just how vital Mr. Georgiadis' cooperation

and testimony were.

What also sets Mr. Georgiadis apart is that he affirmatively and voluntarily withdrew from the Levys' conspiracy in 2008, well before the Levys terminated their scheme to pump and dump the Cardiac Networks, Inc. ("Cardiac") stock in 2010, and he began cooperating with the government even before he had entered into a plea agreement in early 2013. These decisive actions served as an important precursor to Mr. Georgiadis' eventual and unequivocal acceptance of responsibility. In his own words, as expressed in his letter to the Court, Mr. Georgiadis explains: "I am deeply sorry for and ashamed of my criminal misconduct. I have harmed the victims of the penny-stock scheme and I have caused suffering for my family. There isn't a single day that goes by in which I don't look at myself in the mirror, think about my actions, and question how I could have done what I did." Mr. Georgiadis' lack of education and sophistication – he is a high school drop-out who worked as a car salesman and ran a family pizzeria for many years prior to transitioning into penny-stock investments – coupled with his need to provide for his elderly parents, wife and three children, explain in part why he initially made the terrible decision to go along with the Levys. But Mr. Georgiadis understands that any such explanation does not excuse his crime. He is a changed man.

Mr. Georgiadis was one among many participants in the Levys' expansive criminal enterprise. While he provided testimony in support of the government's case regarding incriminating conversations he had with the Levys concerning the Banneker, Inc. ("Banneker") scheme, he promoted only one of the four stocks that the Levys manipulated as part of the charged conspiracy (Cardiac). It is worth noting that each of the other three promoters sentenced by the Court (Stinson Bland, William Mackey, Bradley Susser) faced an advisory guidelines range of 30-37 months, and the government recommended that the Court impose a sentence within that range. Doc. No. 169 at 2 of 8 (Bland); Doc. No. 171 at 2 of 7 (Mackey). Nonetheless, in each instance, the Court sentenced below the advisory guidelines range and below the government's recommendation: Susser received

6 months, Bland 13 months, and Mackey 18 months. Doc. Nos. 170, 173, 310. Additionally, two other co-defendants received time-served/probationary sentences.

Mr. Georgiadis' circumstances are much more compelling than those of his co-defendants. Standing alone, Mr. Georgiadis' trading activity and his participation in the Levys' deception of Cardiac insiders (one of whom, as discussed below, has written an attached letter forgiving Mr. Georgiadis) would perhaps make him more culpable than the other three promoters and the two co-defendants who received probationary sentences. But Mr. Georgiadis deserves a lesser sentence than the other three promoters and a probationary sentence similar to the two other co-defendants in view of the following factors that distinguish Mr. Georgiadis: (1) he provided unique and invaluable cooperation, including credible and persuasive trial testimony, that earned him – and only him – a § 5K1.1 letter from the government; (2) he voluntarily withdrew from the Levys' conspiracy; (3) he began to cooperate even before reaching a plea agreement; (4) he lacked certain other promoters' education and sophistication in carrying out his role in the conspiracy (*e.g.*, he did not use offshore accounts); and (5) his personal and family circumstances (as discussed below).

Although Mr. Georgiadis' advisory guidelines range (78-97 months under the current U.S.S.G.) is greater than that of the other three promoters, this fact is terribly misleading. His advisory guidelines range is largely the result of a current U.S.S.G. loss table that contains draconian escalations in punishment as compared to the 1987 U.S.S.G. loss table, which this Court apparently has looked to in determining the sentences for other defendants in this case. Applying the 10-level enhancement under the 1987 loss table for a $4.3 million loss figure, rather than the 18-level enhancement under the current loss table, results in a range of 33-41 months. Moreover, applying a 2-level enhancement under the 1987 guidelines for the number of victims, rather than a 6-level enhancement under the current guidelines, further reduces the range to 21-27 months.

And that is just a starting point. It does not account for Mr. Georgiadis' invaluable and extensive cooperation or the government's § 5K1.1 letter. Nor does it credit the fact that Mr. Georgiadis (1) netted only a fraction of the total $4.3 million loss attributed to him (*i.e.*, about $1 million of the approximately $4.3 million in proceeds from the sale of Cardiac stock), and (2) invested another $1 million of those proceeds back into Cardiac.

Accordingly, we respectfully urge the Court to impose a probationary sentence on Mr. Georgiadis (including community service and home detention as conditions of probation). Such a sentence also will promote respect for law because it will encourage others to cooperate. The Court may impose probation either as a downward departure pursuant to the government's § 5K1.1 letter, a downward departure because the "amount of loss" and "number of victims" factors overstate the seriousness of the offense, and/or a downward variance pursuant to 18 U.S.C. § 3553.

## II. MR. GEORGIADIS' INVALUABLE AND EXTENSIVE COOPERATION AND CRITICAL TRIAL TESTIMONY AGAINST THE LEVYS

Prior to Mr. Georgiadis' plea, and at his direction, his lawyers engaged in numerous attorney proffers – both in person and telephonically – with AUSA Howard Master and the federal agents. These sessions lasted many hours over the course of numerous days, and included government inquiries into various specific areas of interest subject to the government's investigation. The goal of these sessions was to communicate to the government what Mr. Georgiadis knew and how he could assist. These sessions also allowed the government to assess whether Mr. Georgiadis should receive a non-prosecution agreement or a criminal charge. The government made clear at the time that it had an open mind on this issue.

The pre-plea efforts culminated in an in-person "queen for a day" interview of Mr. Georgiadis by the prosecutors and the agents on January 30, 2013. Soon thereafter, in early February

2013, the prosecutors informed Mr. Georgiadis, through his counsel, that while they recognized his cooperation and several mitigating factors in his favor that supported a non-prosecution agreement, they believed that on balance he needed to plead guilty. While Mr. Georgiadis obviously had wished for a different decision, he promptly agreed to plead guilty and continue with his cooperation.

Mr. Georgiadis subsequently met in person with the prosecutors and agents on numerous occasions both prior to and during the Levys' trial. Due to Mr. Georgiadis' limited finances, his counsel did not participate in any of his post-plea cooperation sessions. Mr. Georgiadis did his best to accurately recall the myriad details of the Levys' scheme, and he spent countless hours assisting the government, including numerous meetings with the prosecutors and/or their agents: "Preparations for trial and prospective cross-examination were lengthy and required Georgiadis to spend substantial amounts of time away from family and focused on his criminal conduct." Govt. § 5K1.1 Ltr. at 3-4 of 6. Additionally, Mr. Georgiadis took the witness stand in the Levys' trial and testified for multiple days. He withstood an emotionally-trying cross-examination and gave critical testimony that the jury found credible and persuasive in returning guilty verdicts against the Levys.

At trial, the government called only two cooperating witnesses: Mr. Georgiadis and Joseph Saranello. "Cooperating witness Fotis Georgiadis testified about his participation in the scheme targeting [Cardiac] and in Donna Levy's manipulator-for-hire activities, and also reported on conversations with both of the Levys concerning the scheme targeting [Banneker]." Govt. App. Br. at 6. Meanwhile, Saranello's testimony was limited to "David Levy's efforts to launder crime proceeds via shell companies that Saranello maintained in Panama and how David Levy used another one of Saranello's shell companies to facilitate the GDGI stock fraud scheme." Govt. App. Br. at 6. Thus, Mr. Georgiadis was the only insider to provide cooperating testimony against the Levys concerning the origination, structure and mechanics of the Cardiac and Banneker schemes:

"Georgiadis offered the only insider's perspective on Donna Levy's manipulation-for-hire scheme …. He also was able to explain, in a way that the victims of the [Cardiac] fraud could not, how the scheme worked, the lies that were told to facilitate it, and the roles of the various participants in the scheme." Govt. § 5K1.1 Ltr. at 4 of 6.

With respect to Cardiac, Mr. Georgiadis testified about his private conversations with the Levys in which David Levy orchestrated the scheme and made the incriminating statement that they would "have enough paper to sell for years." Govt. App. Br. at 8. Mr. Georgiadis also explained to the jury how David Levy came up with the idea to avoid the "5 or 10 percent rule" – *i.e.*, restrictions on the ability to sell shares – by fraudulently placing the stock in the names of people they trusted. Govt. App. Br. at 8. In sum, Mr. Georgiadis' testimony against David Levy was critical.

Likewise, Mr. Georgiadis provided essential testimony against Donna Levy, as the government described at length in its opposition to the Levys' appeal:

Georgiadis described how Donna Levy: (a) made certain that the targeted stocks had a low number of freely-tradeable shares, or 'float,' and could be easily manipulated; (b) developed a schedule of news releases to be issued by the companies whose stocks she was pumping up; (c) coordinated that schedule with misleading and effective third-party promotions recommending the purchase of the targeted stocks, which she would fund and coordinate, but that would appear to prospective investors to be independent; (d) leaked information to message boards, close associates, and other stock promoters in advance of a promotion so that they and associates would 'prebuy' the targeted stock in order to 'build[] a chart' showing upward movement in price and trading volume of the targeted stock; and (e) coordinated the sales of the

targeted stock by herself or through co-conspirators with the promotional campaigns

to maximize profits from stock sales pursuant to the scheme.

Govt. App. Br. at 24-25. Thus, in the government's own words, "Georgiadis' testimony alone was sufficient to establish Donna Levy's guilt on several counts …." Govt. App. Br. at 25.

The government also relied heavily on Mr. Georgiadis' testimony to drive home their points during closing argument when it mattered most. To highlight the weight of Mr. Georgiadis' testimony, and distinguish his testimony from that of other witnesses, the government reminded the jury that this was no ordinary testimony, but that of an insider: "And then Fotis, who participated in defendants' schemes, he explains the scheme the same way as Alan Weiner. Fotis gives you an insider's view. He was a member of the conspiracy. And as a member of the conspiracy, he could tell you exactly how it worked like few others could." Trial Tr. at 1710:24-1711:3. The government then invoked Mr. Georgiadis' name and cited his testimony against both David Levy and Donna Levy repeatedly throughout the closing. Trial Tr. at 1708-11, 1713, 1715-16, 1718, 1720-23, 1725-26, 1756, 1906, 1911, 1913, 1916-17, 1929-31, 1935, 1939, 1945. This strategy was effective and the jury clearly found Mr. Georgiadis' testimony credible and persuasive in returning guilty verdicts against the Levys.

Mr. Georgiadis' cooperation was not limited to the Levys and his trial testimony. To the contrary, "Georgiadis also provided information on other individuals involved in stock promotion and stock fraud, including [name omitted] and others who worked with him while he was a promoter-for-hire. His cooperation included multiple conversations with law enforcement agents about potential subjects of investigations both before and after the Levys' trial, and he has remained ready, willing, and able to testify again if needed." Govt. § 5K1.1 Ltr. at 4 of 6.

In its § 5K1.1 letter, the government strongly praised Mr. Georgiadis for his invaluable cooperation and testimony:

> Georgiadis' cooperation was both significant and useful. … Georgiadis not only provided information on former co-conspirators, he engaged in what may be the most significant and substantial type of cooperation, testimony at trial concerning those former co-conspirators. He prepared diligently for trial, reflecting due respect for his obligations as a cooperating witness. He offered testimony that was corroborated by other sources of information but that, as set forth above, was unique in many ways, offering an insider's view into Donna Levy's market manipulation operation and the inception of [the Cardiac] and [Banneker] schemes. While it is not possible to determine whether the Levys would have been convicted without Georgiadis' cooperation, the Government respectfully submits that the jury's swift and definitive verdict, and the lack of any support for a challenge to the sufficiency of the evidence against the Levys, reflects in no small part the significance and usefulness of Georgiadis' testimony at trial. The cooperation was particularly significant because the Levys were the most culpable participants in the charged scheme, and were among the more significant participants in pump and dump stock fraud in the United States at the time of their arrest and conviction.

Govt. § 5K1.1 Ltr. at 4-5 of 6.

In sum, Mr. Georgiadis went to great lengths to cooperate with the government, and he was a central and invaluable witness in securing the Levys' convictions.[1]

---

[1] The government notes that it initially interviewed Mr. Georgiadis while he was accompanied by Cardiac's then-corporate counsel, and that Mr. Georgiadis "was not fully forthcoming at the initial (footnote continued)

## III. MR. GEORGIADIS' HUMBLE UPBRINGING, LACK OF EDUCATION, CLOSE FAMILY TIES, AND SINCERE ACCEPTANCE OF RESPONSIBILITY

Mr. Georgiadis was born in 1974 and is 40 years old. His parents are originally from Greece – his father is a retired cook, his mother is a retired waitress, and the family was working poor when Mr. Georgiadis and his two sisters were growing up. Nonetheless, Mr. Georgiadis has always "enjoyed a loving relationship" with his elderly parents and, as a result, considers his childhood a good one despite their financial struggles. Doc. No. 417 at ¶ 72.

Mr. Georgiadis' mother recounts their extremely humble beginnings, and Mr. Georgiadis' devotion to his parents, in her letter to the Court (which is written in English by their priest because his mother still does not speak English):[2]

> I had to go to work at a very young age in the mountains raising sheep and goats. I went through war in Greece and experienced things that were hard for me at such a young age. I married young and my marriage was arranged. … With limited education – me completing only the 4th grade and my husband only completing the 5th grade – and not knowing the [English] language, there was not much choice for

---

interview. Realizing that he had been wrong to withhold evidence from the Government, he immediately reached out to the Government and stated that he would cooperate with the assistance of independent counsel." Govt. § 5K1.1 Ltr. at 3 of 6. Without waiving any attorney-client privilege, it is enough to note that Cardiac's then-corporate counsel – who was not a litigator and had little or no knowledge in criminal law – had a conflict of interest and made certain statements to Mr. Georgiadis that resulted in a difficult initial interview with the government. With his lack of education and lack of an appropriate lawyer stressing the importance of telling the whole truth, and terrified for his family and himself, Mr. Georgiadis did not tell the whole truth. However, the very next morning, Mr. Georgiadis promptly called one of the agents, acknowledged that mistakes were made, and advised that he would cooperate with the government after obtaining new counsel. That is precisely what happened and the "Government has no reason to doubt that information provided by Georgiadis in all other proffer sessions and at trial was truthful, complete, and reliable." Govt. § 5K1.1 Ltr. at 5 of 6. This series of events reflects Mr. Georgiadis' basic good character.

[2] All letters to the Court that are mentioned herein are attached.

work [in New York] other than what we knew. So we immediately went to work in a diner – my husband as a cook and me washing dishes and anything else that was needed. We were living all together in one house – me, my 3 children, my husband, his brother and wife, and his son. This was too much to handle. Soon we saved enough money and we moved to New London, CT. … Me and my husband worked 362 days a year from morning to night. This was very tough on all my kids, growing up and not seeing their parents often. … Your Honor, my son Fotis lived a tough life; as much as me and my husband wanted to be home, it was hard. We lived in a not so good area. My son Fotis was home with my oldest daughter. He never complained about anything. I would come home and he would have a big bucket of warm water and he would put salt in it and rub my feet. My son would say to me, Mama, one day you won't have to work like this, and regardless of anything, I will take care of you forever.

Mr. Georgiadis dropped out of high school early in his eleventh grade year in poor academic standing. Due to the family's financial difficulties, he believed he needed to work. Doc. No. 417 at ¶ 85. Between roughly 1993 and 1996, without a high school diploma or GED, Mr. Georgiadis found work as a car salesman. Doc. No. 417 at ¶¶ 91-92. Those sales positions did not work out and Mr. Georgiadis instead opened a family run pizzeria, which he owned and operated over an approximately ten year period from roughly 1996 to 2006. Doc. No. 417 at ¶ 90.

In 2002, while running the pizzeria, Mr. Georgiadis met Candice Piccini, a jewelry designer, and they fell in love. As Candice Piccini (now Georgiadis) writes in her letter to the Court: "The character traits I would like to tell you about are what made me see he was my soul mate and partner in life. He is hardworking, dedicated family man, and a truly giving good-hearted person."

Three years later, in 2005, they married and today they have three children – a nine year old son and twin 6 year old daughters – who they love dearly.[3] Candice Georgiadis writes about the unimaginable toll any period of incarceration would have on their children given how close Mr. Georgiadis is with them and how much they rely upon their father at this early age:

> I know that neither the children nor Fotis could live a day without each other. They look forward to us both attending every school event or sports. My son and husband are extremely close, my son looks up to him and looks for his help every day with homework and projects. Athanasios, our son, has become very attached to Fotis; he is always looking to him to go fishing, play ball or go biking around. He often just watches and observes my husband and then repeats his actions, which is why Fotis is committed to being the best father and man he can be. I am afraid of what having Fotis separated from our son would do to him.

Mr. Georgiadis met the Levys in or about 2005 and began to dabble in penny-stock investments. With the added pressure of a newborn in 2006, coupled with the need to support his aging parents, Mr. Georgiadis moved his parents, wife and infant son to Los Angeles in 2007 to try his hand full-time in the securities markets and the movie business (Doc. No. 417 at ¶¶ 88-89) despite no real prior education, experience, or training in either industry. It was during this general time frame that Mr. Georgiadis unfortunately became involved in the Levys' conspiracy. The approximately $1 million that Mr. Georgiadis himself kept from his role in the fraud was lost in subsequent (and lawful) securities trading. His movie production company also failed, leaving him out of work. Doc. No. 417 at ¶¶ 87-88.

---

[3] Mr. Georgiadis and his wife chose not to have their children write letters given their ages.

Mr. Georgiadis independently and voluntarily broke from the Levys in 2008 well before the Cardiac conspiracy came to an end in 2010. Doc. No. 417 at ¶¶ 32-33. Significantly, and as a reflection of his basic honesty, Mr. Georgiadis reported all of his gains from the fraud and otherwise on his tax returns. In recent years, he has been a law-abiding member of society and trying to rebuild his life. Those efforts include teaching himself how to construct iPhone applications, and Mr. Georgiadis hopes to find steady work in this field in the near future, as he writes in his letter: "I have taught myself a new skill – one that I am quite proud of and that will let me make a positive contribution to my community. It has taken me 2 years to learn from online videos how to build iOS phone applications and manage such projects. I now can take a phone application from the initial idea to a finished product."

There is no doubt that Mr. Georgiadis has come to terms with, and accepts responsibility for, his crime. This acceptance has come at a heavy price – one filled with deep mental anguish and physical suffering. It hurts him that he was unable to see and realize the impact of the fraud on the victims, who were then faceless purchasers of the securities during the Levys' pump and dump schemes. While involved in the Levys' conspiracy, Mr. Georgiadis rationalized to himself that he was not committing a crime because he did not himself make false statements to the investors and because he was told that the boilerplate disclaimers at the end of the false touts would insulate everybody from legal responsibility. Although Mr. Georgiadis' lack of education and sophistication contributed to those and other false rationalizations, they do not excuse his crime.

Candice Georgiadis describes in heart-breaking detail what Mr. Georgiadis' mistakes have done to him and his family, and the resulting personal transformation in him, which clearly show that he is a new man and does not pose a risk of recidivism:

I have had long conversations with my husband about his wrong doings and how regretful he is about the mistakes he has made and the anguish it has caused our family and others. This entire experience has been extremely painful for my husband; knowing that his actions caused harm to others has put him into a depression. He is not the same person he was when I met him; he was always full of life and very confident, [but] today he barely leaves the house. I know in my heart that he would never repeat his actions. … [H]e is also very scared and worried about his outcome that he falls in a depression on some weeks and it takes some time for me to get him back on track. His anxiety over this case is really bad, and sometimes I get really worried about his health. … I see the pain in him every day; he tries to put a happy face on for the children and his parents and me but I can see his soul inside is hurting for what has happened. I wake to him pacing in the middle of the night and sometimes sobbing for the pain he has caused people and his family. If given a second chance, I know he will pay back society and be an honest, hard-working person and role model for our 3 young children.

Both Mr. Georgiadis' wife and mother attest to the fact that his elderly, non-English speaking parents rely exclusively on Mr. Georgiadis for their daily needs, and that Candice Georgiadis, who does not speak Greek, cannot support his elderly parents along with her work and other family obligations. As Candice Georgiadis writes in her letter: "Your Honor Judge Crotty, I plead with you to give my husband … leniency in his sentencing of probation; I cannot alone handle my business and helping his elderly parents and our three children alone. Please give us the chance to rebuild our life." Similarly, Mr. Georgiadis' mother explains in her letter: "He had to explain everything to us from doctors to bills and banks and pretty much everything. My son still today does everything for

me and my husband. … If my son is to be incarcerated, it will be very tragic on his children and his wife. Me and my husband will be lost without him and my daughter-in-law can't understand Greek. I pray to God that you may hear a mother's wish."

Candice Georgiadis' description of her husband's character, forged in part by the suffering he has brought upon himself, are well supported by others outside their immediate family. Laura Salafia, a friend of ten years, describes Mr. Georgiadis in her letter as a "hard-working, inspired, family man" with "a wonderful sense of community. He supports St. Jude's Children's Hospital and the Greek Orthodox Church, which he holds very close to his heart." Likewise, in his letter, Robert Mendez, another dear friend, writes that Mr. Georgiadis is "an industrious, hardworking, family man who is community minded and other-centered." Yet another friend, Kristi Haivala, describes meeting Mr. Georgiadis after Kristi's childhood friend, Angi, was diagnosed with cancer and Kristi had started a campaign to assist Angi in raising the funds necessary to get proper treatment. In her letter, Kristi writes: "I made a video and sent it around to everyone I knew – somehow it ended up reaching Fotis. I had never met him before, but Angi's story touched him and he reached out to me offering financial assistance, and to host a webpage to help raise money for her family." This unusually charitable response to a complete stranger's plea for help reveals Mr. Georgiadis' good heart.

Dore Charbonneau, a friend who works for a national children's charity, highlights in her letter Mr. Georgiadis' core goodness and proven track-record of assisting others in his community: "Fotis became a generous friend to our charity and attended fundraising events, participated in auctions and even hosted a large reception in his home to introduce our new CEO to our other supporters in the area. He sincerely cares about our work and has often shared his enthusiasm with others. We are truly grateful for his kind support." Similarly, in his letter, a pastor at St. Ann Melkite Greek-Catholic Church describes more of Mr. Georgiadis' charitable contributions to those in his

community: "A number of years ago, we needed a new roof, as well as a new furnace for the church and rectory, and we had no money to pay for them. One day I found a check for $25,000 in the St. Jude donation box. … I sent him a letter of profound gratitude and told him how desperate we were for money for the roof and the furnace, which we were able to install thanks to his generosity. A man who wasn't a member of our church!"

Finally, it is not every day that the victim of the charged crime writes a letter supporting the perpetrator of that crime at sentencing. But this is such a case. Zeev Helfer, the president and CEO of Cardiac, who was a victim of the Levys' pump and dump scheme, writes in his letter to the Court: "I forgive Mr. Fotis Georgiadis and I ask you to forgive Fotis and his family as well." Zeev Helfer is not a person who easily and blindly pardons wrongdoers, as can be seen in his recognition that Mr. Georgiadis is nothing like the Levys: "[Fotis] funded Cardiac as promised and I believe if it was the other way around, the company would not have received a penny from David and Donna. … Today, after some time [has] passed by, I can tell that Fotis Georgiadis was manipulated by David and Donna Levy like all of us!!" Another reason Zeev Helfer has forgiven Mr. Georgiadis is that, like others close to Mr. Georgiadis, Zeev Helfer understands that Mr. Georgiadis has a basically good character:

He is a man that takes care of his parents most of his life. I remember clearly when I had to take a meeting in LA he told me to come stay at his home and not waste money on a hotel. I saw there first-hand how he was a family man and cared for his parents. I also got to witness how he cared for his wife very deeply and for his son …. I know Fotis made a mistake and he owned up to it and I believe that he has remorse and this is very painful for him. … This has taken a toll on him and has been

very brutal. Fotis is kind hearted and I know [he] will do everything in his power to pay back to society.

## IV.    THE ADVISORY GUIDELINES OVERSTATE MR. GEORGIADIS' CULPABILITY

Courts within the Second Circuit have recognized that the advisory guidelines' loss tables for white collar crimes are inherently flawed. "The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013). Another court described "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93, *1 (2d Cir. 2008). Yet another court labeled "the Sentencing Guidelines for white-collar crimes" as "a black stain on common sense." *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008). Even the advisory guidelines themselves provide that "a downward departure may be warranted" where "the offense level determined under this guideline substantially overstates the seriousness of the offense." Application Note 19(C) to U.S.S.G. § 2B1.1.

This Court has expressed some agreement with these courts' views in sentencing two other promoters in this case. Bland Sentencing Tr. at 17-18; Mackey Sentencing Tr. at 25. In Mr. Georgiadis' case, before receiving or considering the government's § 5K1.1 letter, probation calculated a total offense level of 28 with an advisory guidelines range of 78-97 months. Doc. No. 417 at ¶¶ 51-63, 67-68, 101. But 18 of those 28 levels come from a loss calculation of $4.3 million under the current guidelines. Doc. No. 417 at ¶¶ 40, 54. That is significantly more draconian than the 1987 loss table that adds 10 levels (not 18) for the same amount of loss. U.S.S.G. § 2F1.1(b)(1)(K)

(1987 version). Another part of probation's calculation is a 6 level enhancement for the number of victims. Doc. No. 417 at ¶ 55. That too is much more punitive than the 1987 guidelines' 2 level enhancement. U.S.S.G. § 2F1.1(b)(2) (1987 version). Accordingly, a more accurate advisory guidelines total offense level is 16 with a corresponding advisory guidelines range of 21-27 months under the 1987 guidelines.

That advisory guidelines range of 21-27 months still does not account for either (1) Mr. Georgiadis' cooperation and trial testimony, or (2) the fact that Mr. Georgiadis did not profit from the bulk of the $4.3 million loss. He testified at trial that, in 2007, he distributed those funds as follows: (i) about $1 million went back to Cardiac as an investment in the company, (ii) about $1 million went to Donna Levy in what Mr. Georgiadis understood was the amount required to cover her marketing expenses, and (iii) the remainder was split evenly with David Levy. Trial Tr. at 615-16. That left Mr. Georgiadis with around $1 million in personal gain. Critically, it meant that about $1 million of the approximately $4.3 million went directly into Cardiac, one of the companies victimized by the Levys' scheme.

Whether as a downward departure pursuant to the government's § 5K1.1 letter, a downward departure because the "amount of loss" and "number of victims" factors overstate the seriousness of the offense, and/or a downward variance pursuant to 18 U.S.C. § 3553, these facts strongly favor a probationary sentence here.[4]

---

[4] We respectfully submit that the Court should reject probation's recommendation of a 78-month sentence. Not only did that recommendation precede the government's filing of its § 5K1.1 letter, not only did probation concede that "any assistance rendered by the defendant has not been factored into the recommendation," (Doc. No. 417 at 29 or 32), but probation also did not consider the § 3553(a) factors discussed herein.

## V.    MR. GEORGIADIS DESERVES A DOWNWARD VARIANCE

The United States Supreme Court rejected any rule requiring "extraordinary" circumstances to justify a sentence outside the advisory guidelines range. *Gall v. United States*, 128 S. Ct. 586, 595 (2007). The advisory guidelines range is just an "initial benchmark" and "not the only consideration." *Id.* at 596. Indeed, courts "may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). Where "the calculation under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a)." *Adelson*, 441 F. Supp. 2d at 509. Here, the § 3553(a) factors strongly favor probation for Mr. Georgiadis.

### A.    Mr. Georgiadis' History And Characteristics, Including His Cooperation With The Government, Support A Probationary Sentence

One of the key § 3553(a) factors is the history and characteristics of the defendant. Mr. Georgiadis' invaluable and extensive cooperation with the government, including his credible and persuasive trial testimony, are an important part of his history and character, and warrant a probationary sentence. Additionally, Mr. Georgiadis' loving kindness for both family and strangers alike, his central role in caring for his elderly and non-English speaking parents, as well as the lack of education and sophistication that made him relatively more vulnerable to the Levys' persuasion, further counsel in favor of a probationary sentence.

### B.    The Need To Avoid Unwarranted Sentencing Disparities Between Mr. Georgiadis And Other Co-Defendants Supports A Probationary Sentence.

Another important § 3553(a) factor is the need to avoid unwarranted sentence disparities among defendants. Here, as discussed above, Bland, Mackey, and Susser were also promoters and

their sentences were well below the advisory guidelines range (*i.e.*, between 6-18 months). Mr. Georgiadis' cooperation and invaluable trial testimony, as recognized in the government's § 5K1.1 letter, distinguish him from these other three promoters, and he merits a much more lenient sentence than theirs.

Bland was a "manipulator for hire" who served as both promoter and touter, and who coordinated "others' touts in support of manipulation campaigns, advising insiders and promoters on the timing of touts and the selection of touters, and on some occasions routing or arranging for payment to other touters." Doc. No. 169 at 2-3 of 8. His "true purpose in maintaining Penny Payday, which was not disclosed to investors, was to induce readers of the website and recipients of the newsletter to <u>create</u> liquidity and cause the stock to rise by purchasing the stock …." Doc. No. 169 at 4 of 8. Bland participated in "a long-running market manipulation conspiracy – one that netted him over $700,000 in revenue … The defendant's revenue from the conspiracy thus relates to promotional campaigns for many stocks in addition to TLAN and GRNH." Doc. No. 169 at 3 of 8. Moreover, Bland "had a high volume business" and could "tap into all of the major promotion rings and promoters …." Bland Sentencing Tr. at 12-13. Unlike Mr. Georgiadis, Bland did not cooperate with the government, testify against the Levys at trial, or invest any of the ill-gotten gains back into the targeted companies. Also, unlike Mr. Georgiadis, Bland equivocated on his acceptance of responsibility and tried to make excuses for his misconduct at sentencing. Doc. No. 169 at 5 of 8 ("This Court should reject [Bland's] claim, espoused in his letter, that he somehow mistakenly believed he could lawfully engage in the conduct that led to his arrest because he had suffered no adverse legal consequences when he provided material to the SEC, and answered questions at an SEC deposition, concerning a penny stock he had helped promote in 2007 and 2008. … It is difficult to believe that the defendant reasonably could have interpreted the SEC's failure to charge him

civilly at or immediately following his deposition as a green light to proceed with business as usual.").

Meanwhile, Mackey "served as an individual … who coordinated all aspects of manipulation campaigns, including but not limited to touts of the type engaged in and coordinated by Bland and manipulative trading activities. While Mackey did not personally issue fraudulent touts, he paid others in cash and stock to engage in this conduct, and to subcontract touting activities to yet others who would, working in concert, create the false impression that there was genuine investor interest in the stock, and that the touted company had legitimate prospects for long-term success. Mackey also hired out individuals who would engage in manipulative trading activities and other conduct that would help pump up the price of the stock he was being paid to help manipulate." Doc. No. 171 at 3 of 7. Mackey was a "particularly active market manipulator" who "operated with a relatively high level of sophistication and guile," including the use of an "offshore trading account to facilitate market manipulation activities." Doc. No. 171 at 3-4 of 7. "Mackey was sophisticated not only in his use of offshore operations to avoid law enforcement activity, but also in his contacts with high-level market manipulators and in his understanding of these manipulators' objectives and needs." Doc. No. 171 at 4 of 7. His "participation in a long-running market manipulation conspiracy" "earned him over $700,000 in gross revenue …." Doc. No. 171 at 3 of 7. Unlike Mr. Georgiadis, Mackey demonstrated a high level of sophistication and did not cooperate with the government, testify against the Levys at trial, or invest any of the ill-gotten gains back into the targeted companies.

Consequently, it would be an unwarranted sentencing disparity to saddle Mr. Georgiadis with an equal or greater sentence than what these other three promoters received. Indeed, Mr. Georgiadis deserves a much less severe sentence in view of the fact that he is the only one among this group of promoters to earn a § 5K1.1 letter from the government, to testify against the Levys at trial, and to

cooperate with the government prior to entering a plea agreement. None of the other three promoters earned or performed even one of these three actions, let alone all three.

Also, as previously mentioned, two other co-defendants received time-served/probationary sentences. According to the government, while such co-defendants were less culpable than Mr. Georgiadis, their cooperation was also far less extensive and neither testified at the Levys' trial. This fact also militates in favor of a probationary sentence for Mr. Georgiadis.

### C. The Need For Just Punishment And Adequate Deterrence Support A Probationary Sentence

Under § 3553(a), "the court, in determining the particular sentence to be imposed, shall consider … the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant."

A probationary sentence for Mr. Georgiadis accomplishes these goals. While his offense was serious, his invaluable and extensive cooperation even before he agreed to plead guilty sets him apart from his co-defendants and should be reflected in his sentence to ensure his punishment is "just." Mr. Georgiadis also has been crime-free since he independently and voluntarily withdrew from the Levys' conspiracy in 2008, now nearly seven years ago. Moreover, Mr. Georgiadis has been punished significantly already, including the severe mental anguish he has suffered as a result of being in limbo since his guilty plea in early 2013. As his wife has described in her letter, Mr. Georgiadis has struggled with long bouts of depression causing him to wake up in the middle of the night, pace around the house, and sob uncontrollably. "He is not the same person he was when I met him; he was always full of life and very confident, [but] today he barely leaves the house."

A probationary sentence for an invaluable cooperating witness such as Mr. Georgiadis will not undermine general deterrence, and in fact it will promote respect for law, because it will encourage others to cooperate, it reflects Mr. Georgiadis' contributions to the justice system, and it recognizes his sincere acceptance of responsibility. Moreover, there is virtually no risk of recidivism with Mr. Georgiadis, who has learned valuable lessons from his crime, as mentioned above.[5]

## VI.    CONCLUSION

For the reasons set forth above, we respectfully urge the Court to impose a probationary sentence on Mr. Georgiadis in recognition of his invaluable cooperation with the government, his credible and persuasive testimony at trial against the Levys, his independent and voluntary withdrawal from the Levys' conspiracy, his unequivocal acceptance of responsibility, his core decency as a human being, his elderly, non-English speaking parents' reliance on him, and the other significant factors described above.

DATED:    March 19, 2015                   Respectfully submitted,

                                           BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                                              DROOKS, LINCENBERG & RHOW, P.C.


                                           By:      /s/ Ronald J. Nessim
                                                    Ronald J. Nessim
                                                    Bird Marella
                                                    1875 Century Park East, 23rd Floor
                                                    Los Angeles, CA 90067
                                                    (310) 201-2100
                                                    rjn@birdmarella.com

---

[5] Probation notes that if a period of probation is imposed, certain mandatory and standard/special conditions should be imposed. Doc. No. 417 at ¶¶ 28-29. Mr. Georgiadis has no objection to these conditions.